**STATE of Minnesota, Respondent,**

v.

**Rene Julian McKENZIE, Appellant.**

**No. C2–93–436.**

Supreme Court of Minnesota.

Jan. 21, 1994.

John Stuart, State Public Defender and Melissa Sheridan, Asst. State Public Defender, St. Paul, for appellant.

Michael Freeman, Hennepin County Atty., Donna J. Wolfson, Asst. County Atty., Minneapolis, and Hubert H. Humphrey, III, Atty. Gen., St. Paul, for respondent.

SIMONETT, Justice.

A Hennepin County jury convicted defendant-appellant Rene Julian McKenzie of first degree murder in the death of Perry Pajunen. On appeal, defendant McKenzie alleges insufficiency of the evidence, improper admission of testimony, and prosecutorial misconduct. We affirm.

Perry Pajunen was killed May 15, 1991. A homeowner found his body in a wooded lot on April 4, 1992. On April 7, 1992, the police arrested Ian James, a friend of defendant McKenzie, for the murder. The police arrested defendant McKenzie and his girl-friend, Juanita Gatlin, the next day. Defendant McKenzie told the police that James alone killed Pajunen.

The events leading up to Pajunen's death, as testified to at trial, are as follows. Defendant McKenzie and James moved to Minneapolis from Florida to sell drugs. The two lived together in an apartment on Lyndale Avenue South with Gatlin and her cousin, Janine Gatlin, James' girlfriend. One of defendant McKenzie's and James' drug customers was Perry Pajunen.

In March 1991, Pajunen rented a car from Budget Rent-A-Car and then gave the car to James to use. The car was due back at Budget on April 2, 1991. When Pajunen did not return the car on time, a Budget employee called him and told him the company would report the car stolen if the car was not returned. Pajunen looked for the car, found it sometime in early May, and left a note on it. The note said that the car would be reported stolen if not returned. James found the note but did not return the car; instead, on May 6, James, Janine Gatlin and her father, Juwan Benniefield, left Minneapolis for Chicago in Budget's car. They got no further than Black River Falls, where a Wisconsin State Patrol officer stopped them for speeding. Discovering that the car had been reported stolen by Budget, the officer impounded it and arrested Juwan Benniefield, who was driving with a suspended license. The police released James, who identified himself as Richard Garth, but not before confiscating $1600 in cash found in the lining of his coat.

James returned to Minneapolis alone the next day, May 7. He was furious with Pajunen because he assumed that it was Pajunen who had reported the car stolen. James said that the next time he saw Pajunen he was going to kill him. Juanita Gatlin testified that James and defendant McKenzie had numerous discussions about how to get Pajunen to the apartment so they could kill him.

On May 15, 1991, James talked to Pajunen on the phone. James told defendant that Pajunen agreed to make payments to cover the money the Wisconsin police had confiscated. Later that afternoon, Pajunen called

the apartment. He spoke to James and arranged to meet Juanita Gatlin at the corner by the apartment to buy some drugs. During the phone call, James had Gatlin tell Pajunen that James was not going to do anything to him. Gatlin left the apartment to meet Pajunen. Defendant and James followed her to Pajunen's truck at the corner of 25th and Lyndale.

What happened thereafter is contested. The state's version of Pajunen's death is based on the testimony of Wendell Martin, a convicted felon, who testified that while he was in a holding cell talking with defendant, defendant confessed to killing Pajunen. According to Martin, defendant McKenzie related that he and James had lured Pajunen to the apartment with the promise of drugs, and that once Pajunen was in the apartment, James beat him up, pulled a gun and said he was going to do what he had to do; that Juanita Gatlin left the apartment, taking out the garbage, and that after she left, James shot Pajunen once. Martin went on to testify that defendant further recounted that when Gatlin returned to the apartment, she saw Pajunen on his knees in the bedroom, holding his stomach, and told defendant and James that if they were going to kill Pajunen they should get it over with, because she had heard the shot outside. According to Martin, defendant then told him that he had fired three shots, killing Pajunen.

At trial, defendant denied shooting Pajunen and denied discussing the matter with Wendell Martin. Defendant testified that James brought Pajunen to the apartment to buy drugs and the two of them went into James' bedroom to smoke crack. Juanita Gatlin left the apartment to take out the garbage. After she left, defendant heard a gunshot from the bedroom. He opened the bedroom door, bumped into James, and saw Pajunen on his knees, holding his stomach. Defendant claims he told James, who had a gun in his hand, that he should not have shot Pajunen and that he should get Pajunen out of the apartment, but James said he would take care of it and shut the bedroom door. Defendant testified that as he turned to leave the apartment, he heard three more shots. At this time, Gatlin came back into the apart-

ment. James came out of the bedroom, gun in hand, and said that Pajunen had refused to pay him back, so he killed him. Then, according to defendant, James demanded that defendant and Gatlin help get rid of the body. When they refused, James threatened that he would kill them and their families unless they helped him. Defendant claims he lunged for the gun, but James struck him in the head with the gun, drawing blood and stating "Don't let me kill you, Rene," whereupon defendant agreed to help hide the body.

Juanita Gatlin testified at trial that she was outside the apartment when she heard all four shots, although she had originally told the police she had heard only one shot while she was outside. It is undisputed that defendant McKenzie helped James put Pajunen's body in a garbage can and leave it in a deserted place, where it was not discovered until almost a year later.

## I.

■ Defendant first contends that the evidence was not sufficient for a jury to find him guilty of first degree murder. We disagree.

Defendant McKenzie claims that the only evidence that he murdered Pajunen is the testimony of Wendell Martin, and that the jury could not have reasonably believed this testimony. McKenzie argues that Martin had a strong motive to lie, because his testimony was the result of a bargain to get probation for his own drug offenses; however, by the time Martin testified at trial he had already violated the probation and was in prison, so he had nothing to gain by testifying as he did. Furthermore, while defendant denies he talked about the murder with Wendell Martin, the jail records show that defendant and Martin spent approximately one and a half hours together in a holding cell, and defendant admits they talked. Significantly, both defendant McKenzie and Martin described the murder and the events surrounding it in nearly the same way, the only difference being defendant's claim that James did all the shooting. It is unlikely that they would have provided such similar accounts had defendant not discussed the murder with Martin.

Defendant's inconsistent stories to the police did not help his credibility. He first denied he was in the apartment or even in Minnesota at the time of the murder, or even that he was McKenzie. He also told the police that the blood stains on the apartment floor were from James' girlfriend, when in fact they were from the victim's blood. There were other inconsistencies, and the jury might well have concluded that defendant's claim that he had been intimidated into a cover-up by James was not credible.

■ In reviewing defendant's appeal, we must view the evidence in the light most favorable to the state and assume that the jury believed the state's witnesses and disbelieved any contrary evidence. *State v. Ulvinen,* 313 N.W.2d 425, 428 (Minn.1981). Here, the jury could reasonably have found that defendant shot Pajunen three times, as Martin testified. Alternatively, based on Juanita Gatlin's testimony that James and defendant had numerous discussions about how to get Pajunen to the apartment so they could kill him, the jury could have found that defendant aided and abetted James in killing Pajunen.

### II.

■ Defendant claims it was reversible error to admit the testimony of Sheila Harden. Over objection, the judge allowed her to testify that sometime during the spring of 1991, during an argument with defendant, defendant told her "he killed once and he would do it again."

If this statement was made before May 15, 1991, the date Pajunen was killed, the statement was evidence of another crime and should not have been admitted because the state did not provide the procedural foundation for such admission. *State v. Slowinski,* 450 N.W.2d 107, 113–14 (Minn.1990). This is defendant McKenzie's claim. But, if the statement was made after May 15, it was properly received as an admission. Minn. R.Evid. 801(d)(2)(A). This is what the state claims.

On this equivocal record, without meeting the procedural requirements for introducing evidence of another crime, it would have been better if Sheila Harden's testimony had not been received. The vagueness of the witness' testimony, however, both as to the content of defendant's statement and when it was made, lessened any significance the testimony might have had, and, indeed, it was not even mentioned in closing arguments. In short, the admission of Harden's testimony was harmless error. *State v. Naylor,* 474 N.W.2d 314, 320–21 (Minn.1991).

### III.

■ Finally, defendant McKenzie argues prejudicial misconduct in the prosecutor's final argument. Anticipating what defense counsel might argue, the prosecutor referred to various defenses, including "the flag defense," *i.e.,* where the defendant wraps himself up in the flag. Rather than objecting, defense counsel used the remark as an opening for taking certain liberties with the record when it was his turn to speak. Clearly, the prosecutor's remark was improper, but in the context of the overall argument was harmless. The other claims of prosecutorial misconduct are without merit.

Affirmed.

PAGE, J., took no part in the consideration or decision of this case.